IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| SEVEN FALLS, LLC, *et. al* ) | Case No. 09-11182 |
| ) | |
| Debtor. ) | (Jointly Administered) |
| _____) | |

**MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 364(C) AND
364(D) AND BANKRUPTCY RULES 4001 AND 9014: (1) AUTHORIZING
THE DEBTORS TO ENTER INTO A DIP FINANCING AGREEMENT WITH
EFO FINANCIAL GROUP, LLC GRANTING LIENS,
INCLUDING PRIMING LIENS, AND SUPER-PRIORITY CLAIMS; AND (2)
<u>REQUESTING FINAL HEARING</u>**

NOW COMES Seven Falls, LLC and Zeus Investments, LLC (collectively the "<u>Debtors</u>"), by and through counsel and pursuant to 11 U.S.C. §§ 364(c) and 364(d) and Bankruptcy Rules 4001 and 9014, and requests that the Court authorize Debtors to enter into a DIP financing arrangement with EFO Financial Group, LLC (the "<u>Lender</u>") according to the terms set forth herein, including but not limited to the granting of liens, including priming liens, and super-priority claims (the "<u>Motion</u>") and in support thereof respectfully shows unto the Court as follows:

<u>Background</u>

1.  Each of the Debtors filed a voluntary petition for relief under Chapter 11 of Lenderruptcy Code (collectively, the "<u>Bankruptcy Cases</u>") on October 26, 2009 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the Western District of North Carolina. Pursuant to Sections 1107 and 1108 of Bankruptcy Code, the Debtors have retained possession of their assets and are authorized to continue operation and management of their businesses.

2.	Seven Falls is a limited liability company organized and existing under the laws of North Carolina with a principal place of business in Henderson County, North Carolina. Its assets consist primarily of 700 acres of developed and undeveloped real estate lots and a partially completed golf course located in Hendersonville, North Carolina.

3.	Zeus Investments is a limited liability company organized and existing under the laws of North Carolina with a principal place of business in Henderson County, North Carolina. Its assets consist primarily of a golf academy and 9-hole practice facility adjacent to the property owned by Seven Falls in Hendersonville, North Carolina.

4.	On December 23, 2009, this Court entered its *Order Authorizing Joint Administration* of the Cases.

5.	This Court has jurisdiction over Bankruptcy Cases pursuant to 28 U.S.C. §§ 157 and 1334(b). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

6.	An official creditors' committee has been appointed in the Seven Falls' bankruptcy case pursuant to 11 U.S.C. § 1102.

**Prepetition Debt**

A.	**Zeus Investments**

7.	NBSC is the holder of a promissory note in the original principal sum of $4,000,000 dated July 2, 2007 (the "Zeus Note").

8.	As security for the Zeus Note, the Debtor executed a Deed of Trust (the "Zeus Deed of Trust") in which it granted NBSC a purported first priority lien in all of Zeus' real property (the "Zeus Collateral").

9.	NBSC properly perfected its security interest in the Zeus Collateral by filing the Zeus Deed of Trust with the Henderson County Register of Deeds.

NPGBO1:1240067.1

10.   The Zeus Note matured February 17, 2009. As of the Petition Date, NSBC was owed the sum of $4,139,360.59, not including attorney's fees on the Zeus Note. Interest continues to accrue on the balance due under the Zeus Note at the rate of $638.89 per diem.

11.   The Zeus Note and Zeus Deed of Trust are collectively referred to as the "Zeus Loan Documents".

12.   The priority of NBSC's lien in the Zeus Investments Collateral is in dispute as numerous contractors have asserted liens ahead of NBSC.

**B.    Seven Falls**

13.   NBSC is the holder of a promissory note in the original principal sum of $13,000,000 dated December 20, 2007 (the "First Seven Falls Note").

14.   As security for the First Seven Falls Note, Seven Falls executed a Deed of Trust (the "Seven Falls Deed of Trust") in which it granted NSBC, a purported first priority lien in certain real property (the "Seven Falls Pre-Petition Collateral").

15.   NBSC properly perfected its security interest in the Seven Falls Pre-Petition Collateral by filing the Seven Falls Deed of Trust with the Henderson County Register of Deeds.

16.   The First Seven Falls Note matured March 2, 2009. As of the Petition Date, Lender was owed the sum of $11,018,835.19, not including attorney's fees on the First Seven Falls Note. Interest continues to accrue on the balance due under the First Seven Falls Note at the rate of $1,822.09 per diem.

17.   NBSC also is the holder of a promissory note in the original principal sum of $7,500,000 dated December 20, 2007 (the "Second Seven Falls Note").

NPGBO1:1240067.1

18. As security for the Second Seven Falls Note and pursuant to the Seven Falls Deed of Trust, Seven Falls granted NBSC a continuing first priority lien on the Seven Falls Pre-Petition Bank Collateral.

19. The Second Seven Falls Note matured March 2, 2009. As of the Petition Date, NBSC was owed the sum of $7,846,728.42, not including attorney's fees on the Second Seven Falls Note. Interest continues to accrue on the balance due under the Second Seven Falls Note at the rate of $1308.08 per diem.

20. Subsequent to the recording of the Seven Falls Deed of Trust, NBSC executed release deeds with respect to certain of the Seven Falls Pre-Petition Collateral (the "Seven Falls Collateral").

21. Hereinafter, the First Seven Falls Note, Second Seven Falls Note, and Seven Falls Deeds of Trust are collectively referred to as the "Seven Falls Loan Documents."

22. On or about July 2, 2007, NBSC executed a Letter of Credit in favor of Henderson County in the aggregate amount of $6,333,347.00 to secure the payment and performance of the infrastructure for Phase I and the development of the golf course (the "Seven Falls Letter of Credit").

23. On or about July 17, 2008, Seven Falls requested to Henderson County an extension to the Phase I development and approval of Phase II(a) development for the project, which consisted of various facets of road construction. Seven Falls further requested to bond the performance with a $6,000,000.00 performance surety bond with Lexon Insurance Company as surety. NBSC amended its Seven Falls Letter of Credit to indemnify Lexon Insurance Company up to the aggregate amount of $3,240,000.00 (the "Amended Letter of Credit").

NPGBO1:1240067.1

24. Thereafter, on or about July 22, 2008, Henderson County released the Seven Falls Letter of Credit and approved Seven Falls' request for Phase I and Phase II(a) development.

25. Prior to the Petition Date, NBSC set off funds in Seven Falls' money market account in the sum of $599,180.33 and applied these funds to the outstanding balance of its debt.

26. The priority of NBSC's lien in the Seven Falls Collateral is in dispute.[1]

27. Additionally, Bank of Asheville and Irish Lads, LLC each have purported first priority liens in certain of Debtors' other real property, not subject to NBSC's liens.

28. A chart summarizing the outstanding lien claims and priority of NBSC's liens is attached hereto as Exhibit A.

### The Debtors' Need for Post-Petition Financing

29. Debtors are in need of significant funding to, among other things, (i) operate their businesses, (2) complete the Phase I and Phase II(a) infrastructure and the 18 hole golf course, (3) satisfy their obligations to Henderson County under the Performance Guaranty Agreement, and (4) remediate various sedimentation control issues. The completion of the infrastructure and 18 hole golf course is necessary in order to generate revenues to fund each Debtor's plan of reorganization.

30. Debtors are unable to obtain unsecured credit, allowable under Section 503(b)(1) of Bankruptcy Code, sufficient to operate or to make these capital improvements. Debtors have requested that Lender provide it with a loan in the amount of up to $8,495,146, and Lender has agreed, in good faith and pursuant to the terms herein and the Loan Agreement (the "DIP Loan

---

[1] On or about October 23, 2009 and prior to the Petition Date, Landscapes Unlimited, LLC d/b/a Landscapes Unlimited of Nebraska, LLC (" Landscapes") instituted an action in the General Court of Justice, Superior Court Division, Henderson County, North Carolina, Case Number 09 CvS 2099 ("State Court Action) seeking, among other things, a judgment declaring the relative positions and priorities of Bank, Landscapes, and Taylor and Murphy

Agreement") to be entered between Debtors and Lender, to provide such funding through a debtor-in-possession loan (the "DIP Loan"). A true and accurate copy of the executed commitment letter is attached hereto as Exhibit B.

### DIP Loan

31. The commitment letter provides for a total commitment of up to $8,495,146. The amount of the commitment available under the DIP Loan shall not exceed 50% of the "as completed" value of the Collateral as defined below. The Debtors believe that the value of the Collateral will support borrowing the maximum amount allowed under the commitment letter.

32. As security for all loans, advances, and any other indebtedness or obligations, contingent or absolute which may now or from time to time hereafter be owing by the Debtors to the Lender under any DIP Loan Agreements [2] (all such loans, advances, and other indebtedness or obligations, together with any obligations at any time incurred by the Debtors on or after the Effective Date to the Lender, collectively, the "Postpetition Indebtedness"), the Debtors propose to grant to the Lender the following liens (the "Postpetition Liens"): (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all unencumbered property of the Debtors; and (b) pursuant to section 364(d)(1) of the Bankruptcy Code, perfected first priority, senior priming liens on all of the property of the Debtors including but not limited to the following:

> a first priority mortgage (or deed of trust or similar security instrument) lien on all of the real property in which the Debtors owns and all other property interests, real, personal or intangible of the Debtors, now existing or hereafter acquired, including, without limitation, contract rights and property interests acquired post-

---

Construction Co, Inc. in certain of the Debtor's Property. Debtor subsequently filed a Notice of Removal of the State Court Action to this Court where the matter is currently pending.

[2] The Debtors will endeavor to provide a copy of the DIP Loan Agreement and other related documents in substantial form prior to the Interim Hearing.

petition (hereafter collectively referred to as the "Collateral"). The Collateral will include, but not be limited to, a 1,616.45± acre master planned community in various stages of development and commonly referred to as Seven Falls Golf & River Club, which Collateral includes (a) approval for 980 residential units, 45,000 square feet of retail space, and a 25,000 square foot clubhouse with related amenities, (b) a 19-hole Arnold Palmer Premier golf course in various stages of development, (c) a fully developed 55.0± acre golf practice area, and (d) a fully developed 6,500± square foot golf academy located within the City of Hendersonville in the State of North Carolina.

33. The proposed terms and conditions of the Postpetition Liens described in paragraph 32 do not include avoidance power recoveries which shall remain with the Debtors.

34. The Postpetition Indebtedness shall have priority in all of these Bankruptcy Cases in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code ("Superpriority"), subject only to any fees owing to counsel for the Borrower in an amount not to exceed $150,000 and to the Bankruptcy Administrator for the United States Bankruptcy Court for the Western District of North Carolina (collectively, the "Carve-out") As a result of the grant of a Superpriority claim, no costs or administrative expenses which have been or may be incurred in the Debtors' Bankruptcy Cases, in any conversion of the Debtors' Bankruptcy Cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related thereto, and no priority claims, including, without limitation, any other Superpriority claims, are or will be prior to or on a parity with the Superpriority claims of the Lender other than the Carve-Out.

35. The Lender is willing to make the DIP Loan only if the Debtors waive their right to charge the Postpetition Liens with any costs or expenses arising under section 506(c) of the Bankruptcy Code other than the Carve-out. The Debtors have agreed, subject to this Court's approval, to the waiver of such rights.

36. Other significant provisions of the DIP Loan include the following:

(a) <u>Term</u>. The maturity date of the Loan shall be the date which is twelve (12) months after the date of the Closing of the initial advance of the Loan (the "Maturity Date"). The Borrower shall have the option, provided no default exists, to extend the term of the loan for an additional twelve (12) months after the Maturity Date.

(b) <u>Extension Fee</u>. As a condition of the Loan Extension, the Borrower shall, on the original Maturity Date, pay to Lender an Extension Fee calculated as three percent (3.00%) of the sum of the unpaid principal balance of the Loan outstanding as of the original Maturity Date and the principal amount of the Loan which has not been advanced as of the original Maturity Date. Additionally, upon the maturity of the Loan Extension, in addition to the then outstanding principal balance of the Loan and all accrued and unpaid interest, an additional sum equal to two percent (2.00%) of the sum of the outstanding principal balance of the Loan as of the original Maturity Date and the principal amount of the Loan which has not been advanced as of the original Maturity Date.

(c) <u>Budget Use of Proceeds</u>. Loan proceeds shall be used by Borrower in accordance with the budget and in substantially the same form as that which is attached to the Commitment Letter as Exhibit "A" (the "Budget"). Proceeds from the Loan shall be disbursed into an escrow account from which draws shall be disbursed (the "Escrow Account").

(d) <u>Interest Rate</u>. The interest rate shall be fourteen percent (14.00%) per annum.

(f) <u>Payment.</u> Monthly payments of interest only on the unpaid principal balance shall be due on the first day of each month for the prior month's interest until the Maturity Date of the Loan. An interest reserve for the first year will be required.

(g) <u>Unused Line Fee</u>. Lender shall be entitled to a monthly unused line fee (the "Unused Line Fee") calculated on the basis of thirty-five basis points (35bps; 0.35%) per month of the principal amount of the Note which has not been advanced, commencing thirty (30) days from the date of the initial advance of the Loan.

(h) <u>Loan Servicing Fee</u>. A loan servicing fee calculated as one and one-tenth percent (1.10%) of the Maximum Loan Amount shall be due and fully earned at closing. In the event of a Loan Extension, Lender shall be entitled to an additional amount equal to one and one-tenth percent (1.10%) of the sum of the unpaid principal balance of the Loan outstanding as of the original Maturity Date and the principal amount of the Loan which has not been advanced as of the original Maturity Date.

NPGBO1:1240067.1

(i) <u>Partial Release Fee</u>. A Partial Release Fee per residential lot equal to sixty percent (60.00%) of the Net Proceeds of Sale of each such lot/unit ("Net Proceeds of Sale" being defined as the gross sales price, less real estate commissions, customary closing costs and prorations) shall be paid to Lender. In no event shall the Net Proceeds of Sale be less than those amounts described under Exhibit "D" to the Commitment Letter. The remaining forty percent (40.00%) of the Net Proceeds of Sale shall be returned to the Escrow Account for further uses consistent with the Budget.

(j) <u>Guaranty.</u> Keith Vinson is required to guaranty payment and performance of the Loan aand shall post as collateral to secure his guaranty the sum of $1,000,000.00 in cash deposited in an escrow account maintained in Collier County, Florida .

(k) <u>Fees and Costs</u>. At the funding of the initial advance of the Loan, from the proceeds of such advance, Lender is to receive a commitment fee calculated as five percent (5.00%) of the Maximum Loan Amount plus closing costs. Upon execution of Commitment Letter, Lender is to receive $15,000 Application Fee and $10,000 Legal Fee Deposit

(l) <u>Standby Commitment Fee</u>. Lender shall be entitled to a stand-by commitment loan fee in the amount of two percent (2.0%) of the Maximum Loan Amount which Stand-By Fee shall be earned if, after the Loan has been approved by the Bankruptcy Court, any of the following events occur: (i) the Debtors elect to not enter into the Loan under this Commitment for any reason, (ii) the Bankruptcy Court authorizes the Debtors to obtain financing from an existing creditor or other third party lender in lieu of Lender and the financing is provided by such existing creditor or other third party lender, or (iii) the Debtors fail to satisfy any of the material Conditions contained in this Commitment

## **Basis For Relief Requested**

A. <u>DIP Loan</u>

37. The Debtors have attempted but have been unable to obtain significant post-petition borrowings in the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(a) or 364(b) of the

Bankruptcy Code. The circumstances of these cases instead require the Debtors to obtain their financing under sections 364(c) and (d), and to satisfy the requirements thereof.

38. A debtor seeking financing under section 364(c) or 364(d) of the Bankruptcy Code must make a reasonable effort to seek other sources of credit available under sections 364(a) and (b) but "is not required to seek credit from every possible source." In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (S.D.N.Y. 1990). The Debtors and their advisors have discussed the availability of postpetition financing of the Debtors on terms other than a priming lien under section 364(d) of the Bankruptcy Code with lenders who are in the business of providing debtor-in-possession financing. Each such lender refused to provide unsecured or junior secured financing. The Debtors have satisfied their burden of showing the unavailability of alternative unsecured or junior secured financing and may obtain debtor in possession financing under Bankruptcy Code sections 364(c) and (d).

39. Having determined that financing was available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Loan at arm's length and pursuant to their business judgment. In negotiating debtor-in-possession financing arrangements, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties." Ames, 115 B.R. at 38. Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining the financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain seasonal business); Ames, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised

so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest"). Courts will not override the debtor's prudent and responsible exercise of its basic business judgment consistent with it fiduciary duties to the estate and its creditors in negotiating an appropriate financing package. See In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court.").

40.   The DIP Loan and the interim relief requested herein are necessary to prevent the immediate and irreparable harm to the Debtors' estates that would otherwise result if the Debtors are prevented from obtaining financing for the payment of, inter alia, operating expenses and capital improvements which benefit all creditors of the Debtors' bankruptcy estate, including the creditors with purported liens on the Debtors' real estate, and the homeowners who previously have purchased lots from the Debtors. Indeed, without the financing provided for in by the DIP Loan, the Debtors will not be able to reorganize, will suffer irreparable harm, and their entire reorganization effort will be jeopardized. Attached hereto as Exhibit C is a projection of the use of proceeds from the DIP and revenues generated from such proceeds for a 3 year period. This projection which extrapolated further will be from the basis of the Debtors respective plans of reorganization. Accordingly, this Court should authorize the Debtors to obtain postpetition financing to the extent and pursuant to the terms contained in the commitment letter and in the Interim Order. The Debtors acknowledge that the Lender has acted in good faith in consenting to and in agreeing to provide the postpetition financing contemplated by the Interim Order and the DIP Loan Agreement, and the reliance of the Lender on the assurances referred to above is in good faith.

NPGBO1:1240067.1

41. The Debtors believe that the terms and conditions of the DIP Loan are fair and reasonable, and were negotiated by the parties in good faith and at an arms' length. Accordingly, the Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the arrangements contemplated by the DIP Loan Agreement.

42. The Debtors plan to file an Application for Appointment of a Chief Financial Officer (the "Application") to oversee and supervise the proceeds from the DIP Loan in the operation of their respective businesses and construction of the infrastructure and golf course.

43. Good and adequate cause therefore exists for the approval of the DIP Loan, including that DIP Loan is necessary to minimize disruption of the Debtors' business as a going concern during the Debtors' reorganization, and therefore is in the best interests of the Debtors' estate and its creditors.

### The Interim Approval Should Be Granted

44. Bankruptcy Rules 4001 (b) and 4001 (c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

45. Pursuant to Bankruptcy Rules 4001 (b) and 4001(c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion (the "Preliminary Hearing") and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to obtain credit under the DIP Credit Agreement in the amount of not more than $8,495,146. This

will enable the Debtors to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

46. Absent interim financing, the Debtors' objective of restructuring their businesses as going concerns, while maintaining the value of the assets for the benefit of their creditors will fail without a fair opportunity to achieve the purposes of Chapter 11. In the circumstances of these cases, the granting of the relief requested herein is warranted and essential to the reorganization effort.

### Notice

47. Debtors have given notice of this Motion by overnight mail or email to (i) counsel for NBSC, (ii) Irish, Lads, LLC, (iii) Bank of Asheville, (iv) all purported construction lien creditors, (v) the Internal Revenue Service, (vi) the Bankruptcy Administrator and (vii) the top ten (10) largest unsecured creditors of the Debtors as listed pursuant to Fed. R. Bankr. P. 1007, and (viii) any parties who have filed a request for service of all pleadings and notices. The Debtors further have given notice by first class mail to all other creditors in the Bankruptcy cases. The Debtors submit that, given the circumstances present here and the interim nature of the relief being sought, such notice comports with Bankruptcy Rule 4001.

48. No previous request for the relief sought herein has been made to this or any other Court except for the Motion to Incur Post-Petition Unsecured Financing [Doc. #202].

WHEREFORE, Debtors respectfully requests that the Court enter an Order:

1. Scheduling an Interim Hearing on the Debtors' Motion;

2. Authorizing Debtors to obtain post-petition secured financing from Lender pursuant to the terms and conditions of a DIP Loan Agreement; and

3. Granting such other and further relief as the Court deems just and proper.

NPGBO1:1240067.1

This the 21st day of June, 2010.

        /s/ Christine L. Myatt
        Christine L. Myatt
        N.C. State Bar No. 10444
        Attorney for Debtors

OF COUNSEL:

NEXSEN PRUET, PLLC
701 Green Valley Road, Suite 100
Post Office Box 3463
Greensboro, NC 27402
(336) 373-1600
cmyatt@nexsenpruet.com