FILED & JUDGMENT ENTERED
David E. Weich

Jul  06  2010

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
George R. Hodges
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 09-11182 |
| | ) | |
| SEVEN FALLS, LLC *et al*., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Jointly Administered |
| | ) | |

**ORDER GRANTING SYNOVUS BANK'S MOTION TO DISMISS AND DENYING DEBTORS' MOTION FOR SECURED POST-PETITION FINANCING, INCLUDING GRANTING PRIMING LIENS AND SUPER-PRIORITY CLAIMS**

This matter comes before the Court on Synovus Bank's[1] ("Synovus") *Motion to Dismiss* (the "Motion to Dismiss") [Docket Entry 199] and the Debtors' *Motion for Authorization to Obtain Post-Petition Unsecured Financing Pursuant to 11 U.S.C. § 364(b)* [Docket Entry 202], *Second Motion to Extend Exclusivity Period* [Docket Entry 218], *Motion for an Order Pursuant to 11 U.S.C. §§ 364(c) and 364(d) and Bankruptcy Rules 4001 and 9014: (1) Authorizing the Debtors to Enter into a DIP Financing Agreement with EFO Financial Group, LLC Granting Liens, Including Priming Liens, and Super-Priority Claims; and (2) Requesting Final Hearing* (the "Motion for Secured Financing") [Docket Entry 227], and *Application Pursuant to Section*

---

[1] Synovus was previously referred to in this case as The National Bank of South Carolina ("NBSC").

1

*327 of the Bankruptcy Code to Employ and Retain Anderson Bauman Tourtellot Vos & Company Under Interim Management Agreement and Including Designation of Neal Anderson as Their Chief Financial Officer* [Docket Entry 232]. The Court, having reviewed the various motions and pleadings submitted, and having heard these matters on June 24, 2010, finds that the Motion to Dismiss should be granted and that the Debtors' Motion for Secured Financing should be denied. Pursuant to these findings, the Court further finds that the remaining motions shall be deemed moot. In support of the Court's determination, the Court makes the following findings.

## PROCEDURAL HISTORY AND FINDINGS OF FACT

1.  Each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 26, 2009 (the "Petition Date") in the United States Bankruptcy Court for the Western District of North Carolina, Asheville Division. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors have retained possession of their assets and are authorized to continue operation and management of their businesses.

2.  On December 1, 2009, the Debtors made a motion seeking procedural consolidation and joint administration of this Chapter 11 Case and Case Number 09-11183, In re Zeus Investments, LLC [Docket Entry 50], and on December 23, 2009, this Court entered its Order Authorizing Joint Administration of the Cases [Docket Entry 84].

3.  Seven Falls, LLC ("Seven Falls") is a limited liability company organized and existing under the laws of North Carolina with a principal place of business in Henderson County, North Carolina. Its assets consist primarily of 700 acres of developed and undeveloped real estate lots and a partially completed golf course located in Hendersonville, North Carolina.

4.  Zeus Investments, LLC ("Zeus") is a limited liability company organized and existing under the laws of North Carolina with a principal place of business in Henderson

2

County, North Carolina. Its assets consist primarily of a golf academy and 9-hole practice facility adjacent to the property owned by Seven Falls in Hendersonville, North Carolina.

5. The Debtors' real property is encumbered by liens from three secured lenders who assert a security interest in the Debtors' real property, the largest of which is Synovus, which has asserted pre-petition debt in the amount of $26,244,924.20 plus interest and fees[2], and from multiple construction lien creditors who also assert a security interest in the Debtors' real property.[3]

6. The initial exclusive period for the Debtors to file their plans of reorganization expired February 23, 2010. With the consent of Synovus and Landscapes Unlimited, the Court extended this initial exclusive period to April 24, 2010. Synovus and Landscapes Unlimited consented to a second extension of the exclusive period, extending exclusivity to May 24, 2010. This Court granted a third extension to the exclusive period, and the exclusivity period was extended to June 17, 2010.

7. On May 21, 2010, Synovus notified Lexon Insurance Company that it would not be renewing a $3,240,000.00 letter of credit that it issued to secure the payment and performance of the improvements authorized by a Performance Guaranty issued by Henderson County[4].

---

[2] Bank of Asheville has filed a proof of claim in this case in the amount of $1,714,544.44. The other secured lender, Irish Lads, LLC, has not filed a proof of claim, but is scheduled as having a claim in the amount of $2,000,000.00.

[3] These construction lien creditors (and their respective asserted claims) include: Landscapes Unlimited, LLC ($2,696,621.83), Taylor and Murphy Construction Co., Inc. ($1,963,966.14), Miller Brothers, Inc. ($742,431.45), William G. Lapsley & Associates, P.A. ($430,446.31), and Ed Holmes & Associates Land Surveyors ($142,529.11).

[4] The Performance Guarantee authorized the Debtors to complete improvements on certain phases of construction on the property. By its terms, the Performance Guarantee expired June 1, 2010. However, the Debtors have maintained that North Carolina Session Law 2009-406 suspended the running of the period for completion of the required improvements under the Performance Guarantee. Henderson County has objected to this argument. See Henderson County's *Response in Support of Motion to Dismiss Filed by The National Bank of South Carolina* [Docket Entry 246]. The issue of whether the Performance Guarantee has actually expired is not before this Court, so this Court makes no determination as to this issue.

8. On May 27, 2010, Synovus made a motion to dismiss these bankruptcy cases, citing continuing losses to the estate and the absence of a reasonable likelihood of rehabilitation, the Debtors' gross mismanagement of the Estate, and lack of confidence in the Debtors' ability to manage the Estate. Synovus was joined in this motion by The Office of the United States Bankruptcy Administrator for the Western District of North Carolina (the "BA"), Landscapes Unlimited, LLC ("Landscapes Unlimited"), William G. Lapsley & Associates, P.A. ("Lapsley"), and Henderson County. The Debtors filed the only objection.

9. On June 1, 2010, the Debtors made a motion seeking a $250,000.00 unsecured debtor-in-possession loan (the "Unsecured DIP Loan") from their managing member, Keith Vinson ("Vinson"). Synovus, the BA, and Landscapes Unlimited filed objections to this motion.

10. On June 17, 2010, the Debtors made a second motion to extend the exclusivity period for filing their respective plans of reorganization to September 15, 2010 and soliciting acceptances of such plans to October 21, 2010. Synovus and the BA filed objections to this motion.

11. On June 21, 2010, the Debtors made a motion seeking a secured debtor-in-possession loan (the "Secured DIP Loan") from EFO Financial Group, LLC ("EFO") in the amount of $8,495,146.00. The basis for this loan was a "preliminary commitment" from EFO, and as security, the Debtors sought a perfected first priority lien on all unencumbered property of the Estate pursuant to 11 U.S.C. § 364(c)(2) and a perfected first priority, senior priming lien on all of the Debtors' property pursuant to 11 U.S.C. § 364(d)(1). Synovus, the BA, and Lapsley objected to this motion.

4

**CONCLUSIONS OF LAW**

I. **The Motion to Dismiss**

Section 1112(b) demonstrates the reality of Chapter 11-- reorganization is not a "Holy Grail to be pursued at any length." In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 374 (5th Cir. 1987) (Clark, C.J. concurring). Rather, the Court must remember that

> [a] principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors. The secured creditor benefits from a successful reorganization because its secured claim is valued on a going-concern basis in connection with a plan of reorganization, and the secured creditor is not compelled to liquidate its collateral at forced-sale prices. However, when there is no reasonable likelihood that the statutory objective of reorganization can be realized or when the debtor unreasonably delays, then the automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries.

Id. at 373.

The Court shall dismiss a bankruptcy case if cause has been shown. 11 U.S.C. § 1112(b)(1). Section 1112(b) enumerates examples of "cause," including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). However, Courts may also consider "other factors and equitable considerations in order to reach an appropriate result in the individual case." In re Schriock Const. Inc., 167 B.R. 569, 575 (Bankr. D.N.D. 1994).

Substantial or continuing loss to or diminution of the estate "can be satisfied by demonstrating that the debtor incurred continuing losses or maintained a negative cash flow position after the entry of the order for relief." In re Schriock Const. Inc., 167 B.R. at 575. The Debtors' monthly operating reports reveal that for seven months this bankruptcy case was

pending[5], four of those months the Debtors either had no money or a negative ending cash position. Further, during the pendency of this case, administrative expenses continued to grow. The Debtors' last monthly operating report showed administrative expenses totaling $274,078.69 and ending cash position of only $560.28. As such, the Debtors are administratively insolvent. Finally, testimony by the Henderson County Erosion Control Division revealed that, due to continuing erosion control and maintenance violations, total penalties had been assessed against all phases of the property in an aggregate amount of $113,944.76, with penalties accruing at the rate of $1,410.90 per day[6]. As such, the Estate has clearly experienced substantial and continuing losses and the value of the Estate continues to diminish each day.

There is also no reasonable likelihood of the Debtors' rehabilitation. The absence of a reasonable likelihood of rehabilitation is met when the debtor lacks reasonably certain sources of income. In re Continental Holdings, Inc. 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994). Further, "if outside financing is needed" to lead to rehabilitation, "it must be *clearly* in sight." In re The Great Am. Pyramid Joint Venture, 144 B.R. 780,792 (Bankr. W.D. Tenn. 1992) (citing In re K.C. Marsh Co., Inc., 12 B.R. 401 (Bankr. D. Mass. 1981) (emphasis in original). As will be discussed below, while the Debtors submitted a Secured DIP Loan proposal, the proposal itself fails to meet the procedural and substantive requirements necessary to satisfy its condition of being a "super-priority" priming loan. Further, while this case has been pending for eight months, this has been the only substantive post-petition loan proposal submitted by the Debtors. The Debtors failed to demonstrate any other source of funding that was clearly in sight. Therefore, the Debtors have no reasonable likelihood of rehabilitation.

---

[5] This case has actually been pending for eight months. However, the May 2010 Operating Report has not been filed by the Debtors.

[6] The Court makes no findings of fact or conclusions of law as to whether the penalties were properly assessed after the bankruptcy filing.

As further proof that "cause" exists to dismiss this case, the Court is persuaded by the testimony of the Henderson County Erosion Control Division and the exhibits entered demonstrating the condition of the property. Inspections of the property from May and June reveal the dire situation the property is currently in and the erosion control measures that are currently being unmaintained by the Debtors. The lack of adequate groundcover, overflowing sediment traps, compromised weirs, and a general lack of maintenance have all contributed to large-scale sediment movement on the property and an advanced deterioration in the property due to erosion. Indeed, Henderson County Erosion Division characterized the property as an "environmental disaster."

Due to the Debtors' lack of maintenance to the property, Henderson County Erosion Division cited the Debtors with seven notices and continuing notices of violations of the North Carolina Sedimentation Pollution Control Act of 1973. Further, Henderson County Erosion Division testified that the Debtors are not in compliance with the Henderson County Soil Erosion Control Ordinance or the Henderson County Land Development Code. These many violations and failures to comply with state and local environmental regulations warrant sufficient justification that "cause" exists to dismiss this case. See 28 U.S.C. § 959(b) (stating "a debtor in possession [ ] shall manage and operate the property in his possession …according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.")

Despite having ample evidence that cause exists to dismiss the case, the Debtors contend that the continuing losses to the Estate, the deteriorating condition of the property, and the state and local environmental violations will all be remedied with the proposed Secured DIP Loan, and that with the Secured DIP Loan, the Debtors will be able to effectively reorganize. For the

reasons set forth below, the proposed Secured DIP Loan will not be an option for the Debtors and this case will be dismissed.

## II. The Secured DIP Loan

Sections 364(c) and (d) state that the Court "*may authorize* the obtaining of credit or the incurring of debt" during the course of a debtor's bankruptcy. 11 U.S.C. § 364(c)-(d) (emphasis added). Therefore, in determining whether to approve the authorization for post-petition financing, Courts act in their informed discretion. In re Ames Dept. Stores, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Further, Courts have recognized that a debtor's discretion to obtain post-petition financing "is not unbridled" and that "Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment." Id.

Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 may not be commenced earlier than 14 days after the service of the motion. Upon request, however, the Court is empowered to conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

Here, the Court conducted an interim hearing and found that the Debtors failed to meet both the procedural and substantive requirements to obtain post-petition financing that will prime its secured creditors' liens.

### A. The Terms and Conditions of the Commitment Letter are in flux

Mr. Vinson testified that the terms and conditions set forth in the Commitment Letter have not been finalized. For example, EFO has 30 days to complete its due diligence under the terms of the Commitment Letter. Further, Mr. Vinson testified that EFO verbally agreed to change the interest rate set forth in the Commitment Letter in the sum of 14% per annum to 12%.

8

**B. The Debtors have not actually submitted a "Credit Agreement"**

Procedurally, Rule 4001(c) requires that a copy of the proposed *credit agreement* accompany a motion to obtain credit. Fed. R. Bank. P. 4001(c)(1) (emphasis added). On Page 12, Paragraph I, of the "Conditions" section of the proposed commitment letter, EFO specifically states that:

> This Commitment is subject to and conditioned upon the receipt and satisfactory review of the Due Diligence Materials…Thirty (30) calendar days following the later of (a) the acceptance of this commitment, (b) the receipt of the Application Fee [ ] and Legal Fee Deposit [ ] or (c) receipt of all requested Due Diligence Materials [ ] **Lender, in its sole discretion, may choose not to enter into the Loan and terminate this Commitment, for any reason whatsoever**, and shall deliver to the Borrower, in writing, notice of its election to withdraw and terminate the Commitment.
> Without being limited by the foregoing, **the Borrower hereto recognizes that the Lender's willingness to fund the Loan is conditioned upon a full due diligence review of the Project [ ] and that** *the comprehensive nature of that review will be time consuming*. (Emphasis added).

To be sure that the proposal is not to be viewed as final, EFO later states on Page 19 of the commitment letter that

> **This Commitment is not, in and of itself, a document that guarantees funding by the Lender to Borrower in the amounts set forth herein. Only final loan documentation and satisfaction of the conditions set forth above will obligate the Lender to fund the Loan.** (Emphasis in original).

Therefore, on its face, the Debtors have at most presented the Court with an invitation to enter into a lending arrangement with EFO. An arrangement of this sort, based upon as-of-yet drafted final loan documentation is simply not an actual credit agreement.

Further, the actual terms indicate the speculative nature of the proposal. Pursuant to the "**Collateral/Other Rights**" section on Page 5 of the proposal, any loan to the Debtors would be secured by a "1,616.45 +/- acre master planned community in various stages of development and commonly referred to as Seven Falls Golf & River Club… ." However, during testimony,

9

Vinson recognized that the Debtors do not have the requisite number of acres to secure the loan. Therefore, the proposal is conditioned on land assumptions that simply are not true.

In addition, the "**Conditions**" section on Page 12, Paragraph J, of the proposal states that

> Borrower shall have demonstrated and/or Lender, in its sole discretion, shall have determined that there are no environmental, land use, zoning or other governmental or regulatory issues that will adversely impact the Collateral….

As has been discussed, the property is replete with multiple environmental, governmental, and regulatory issues that adversely impact the collateral.

Also, pursuant to the "**Conditions**" section on Page 13, Paragraph M, as a condition for any Secured DIP Loan, Vinson:

> shall post as collateral to secure the performance under the terms of the guaranty the sum of $1,000,000 in cash deposited in an escrow account maintained in Collier County, Florida.

While Vinson testified that he has the ability to post the cash deposit, this ability is certainly in doubt. On January 12, 2010, a judgment was entered against Vinson in the Buncombe County, North Carolina Superior Court in the amount of $2,116,934.89 plus interest plus $22,500 attorneys fees[7]. Further, a second judgment was obtained by Blossoms at Biltmore Park, Inc. ("Blossoms") against Vinson in the Buncombe County District Court in the amount of $4,888.65. On February 19, 2010, Blossoms obtained an order that prohibited a list of twenty banks and credit unions from transferring any funds of Vinson up to the amount of the judgment[8]. Vinson failed to offer an explanation as to why these judgments remain unsatisfied.

Finally, the Secured DIP Loan would be conditioned on the Debtors' ability to meet a minimum lot sales goal. The Debtors' last lot sale was in 2008, yet according to the budget for

---

[7] This judgment is captioned as Suntrust Equipment Finance and Leasing Corporation, as successor to Suntrust Leasing Corporation v. Mountain Jet Services, LLC, Keith Vinson, and Paula Vinson, Case No. 2009CVS000555.

[8] This order is captioned as Blossoms at Biltmore Park, Inc. v. Paula Vinson and Keith Vinson, Case No. 09 CVD 4956.

10

the proposed Secured DIP Loan, the Debtors would be required to reach cumulative sales goals within 90 days of the loan in the sum of $900,000.00 and $7,660,016.00 within the first year of the loan. While Vinson testified that such a target would easily be met, Vinson's own proposed Chief Financial Officer did not express such certainty, and testified that any sales goal is by definition speculation driven by multiple market-based factors, and especially premised on a necessary up-swing in the economy. Therefore, the Debtors have no certainty in being able to comply with the terms of the proposed Secured DIP Loan. As such, not only is the proposed commitment letter not an actual credit agreement, but the terms contained in the proposed commitment letter as conditions for the Secured DIP Loan are simply too speculative for the Debtors to be able to comply.

### C. The Debtors Cannot Demonstrate Adequate Protection to Prime Its Secured Creditors' Liens

Not only have the Debtors failed to meet the procedural threshold of presenting an actual credit agreement, but substantively, the Debtors have failed to demonstrate that the secured creditors' interests will be adequately protected such that their liens could be primed. See 11 U.S.C. § 364(d)(1)(B); In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (both requiring that debtors must provide some form of adequate protection to the holder of existing liens whenever debtors seek post-petition financing on a priming basis).

The ability to prime existing liens is an extraordinary remedy. Suntrust Bank v. Den-Mark Constr., Inc., 406 B.R. 683, 688 (E.D.N.C. 2009) (citing In re Seth Co., 281 B.R. 150, 153 (Bankr. D. Conn. 2002)). In recognizing the importance of preserving the secured creditors' interest in its collateral, Congress stated that

> Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws.

11

> Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interests. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

Id. citing H.R. Rep. No. 595 at 339, 1978, U.S. Code Cong. & Ad. News at 5787, 6295. However, while recognizing the importance of protecting a secured creditor's interest, no bright-line test exists to define the term "adequate protection." Instead, the Bankruptcy Code provides examples of how a secured creditor may be adequately protected: (1) making periodic cash payments to the extent that a priming lien results in a decrease in the value of the secured creditor's interest in the property, (2) granting additional or replacement liens to the extent that a priming lien results in a decrease in the value of the secured creditor's interest in the property, or (3) providing the secured creditor the "indubitable equivalent" of its interest in the property. 11 U.S.C § 361.

While the Debtors' pleadings and budget for the proposed Secured DIP Loan did not indicate any form of adequate protection, at the hearing, the Debtors argued that secured creditors would be adequately protected by both a supposed equity cushion in the property and by an enhancement of value based on projected improvements to the property. Both arguments are unavailing.

In considering the present value of the Debtors' property, both parties entered appraisal values into evidence. According to an appraisal commissioned by Synovus, the as-is value of the property securing Synovus' loans to the Debtors was $5,088,000 as of April 6, 2010. As previously stated, Synovus claimed secured debt in the amount of $26,244,924.20 plus interest and fees. The Debtors, on the other hand, submitted an appraisal dated July 28, 2008 that established the as-is value of the entire property as $84,700,000.00. A more recent appraisal had not been performed by the Debtors. Furthermore, the Debtors' appraisal was for a development

encompassing over 1600 acres, more than twice the size of the Debtors' approximately 700 acres, thus making the value in the Debtors' appraisal further suspect.

The Debtors' own testimony revealed that market conditions at the time its appraisal was performed is not comparable to today's market. In fact, the Debtors testified that their appraisal had been performed before one of the worst housing markets in decades. Therefore, while the Debtors' appraisal may have been an accurate reflection of market value at the time it was performed, it does not reflect a current accurate valuation. Given the recent date of Synovus' appraisal that contemplated current market conditions, this would appear to be a better indication of the as-is market value of the property. See Suntrust Bank, 406 B.R. 683 at 699 (holding "it was the bankruptcy court's prerogative to determine that the testimony of the debtor's witnesses better reflected the realities of the market" in establishing valuation). As such, the Debtors cannot contend an equity cushion exists to offer sufficient adequate protection.

Without an adequate equity cushion, the Debtors next contend that the secured creditors will be protected by an enhancement of value based on projected improvements to the property. However, adequate protection in this form, without a corresponding sufficient equity cushion, is too speculative to approve post-petition financing on a priming basis. See Suntrust Bank, 406 B.R. 683 at 700 (citing In re Swedeland Dev. Group, Inc., 16 F.3d 552 (3d Cir. 1994) (holding "continued construction based on projections and improvements to the property does not alone constitute adequate protection. [citation omitted]. Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements. [citations omitted]. We reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to

13

be profitable); In re YL West 87th Holdings I LLC, 423 B.R. 421, 443 (Bankr. S.D.N.Y. 2010) (holding "Even if the Court were persuaded by [the Debtors'] valuation of the Subject Property and found that the Debtor had some equity in the Collateral, priming would still be denied under section 364(d) because it is highly speculative whether the Project can be completed in the first instance"); In re Chevy Devco, 78 B.R. 585, 589 (Bankr. C.D. Cal. 1987) (holding that existing mortgagee would not be protected if it was primed by a new construction loan and superpriority lien because the potential success of the renovation project is too speculative.))  Given the nonexistence of an equity cushion in the property and the fact that any enhancement of value in the property is too speculative, the creditors cannot be adequately assured of the indubitable equivalence of their existing security.

For all of the reasons discussed, the Debtors' request for priming their secured creditors' liens would fail.  Without any other source of financing, the Debtors have no hope for an effective reorganization.   Accordingly,

**IT IS THEREFORE ORDERED**

1. That Synovus' Motion to Dismiss is granted.
2. That the Debtors' Motion for Secured DIP Financing is denied.
3. That the Debtors' *Motion for Authorization to Obtain Post-Petition Unsecured Financing Pursuant to 11 U.S.C. § 364(b)*, *Second Motion to Extend Exclusivity Period*, and *Application Pursuant to Section 327 of the Bankruptcy Code to Employ and Retain Anderson Bauman Tourtellot Vos & Company Under Interim Management Agreement and Including Designation of Neal Anderson as Their Chief Financial Officer* shall all be deemed moot.

14

4.  That nothing contained in this Order shall determine the respective creditors' lien priority.

**This Order has been signed electronically.**  **United States Bankruptcy Court**
**The judge's signature and court's seal appear**
**at the top of the Order.**